**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No.: 21-461-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| RAKUTEN, INC., EBATES PERFORMANCE MARKETING, INC. dba RAKUTEN REWARDS, and EBATES INC. dba RAKUTEN, | ) ) ) ) ) ) | |
| Defendants. | ) | |
| EBATES PERFORMANCE MARKETING, INC. dba RAKUTEN REWARDS, | ) ) ) ) | |
| Counterclaim-Plaintiff, | ) ) | |
| v. | ) ) | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Counterclaim-Defendant. | ) ) | |

**EBATES PERFORMANCE MARKETING, INC.**
**DBA RAKUTEN REWARDS' COUNTERCLAIMS**

Without admitting any of the allegations of the Complaint or First Amended Complaint filed by International Business Machines Corporation ("IBM" or "Counterclaim Defendant"), and without prejudice of the rights of Ebates Performance Marketing, Inc. dba Rakuten Rewards ("Ebates Performance Marketing" or "Counterclaim Plaintiff") to plead additional Counterclaims as the facts of the matter warrant, Ebates Performance Marketing, by and through its counsel, hereby asserts the following counterclaims against IBM.

## PRELIMINARY STATEMENT

1.      These Counterclaims for patent infringement arise under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*

2.      IBM *claims* to be "in the innovation business." (D.I. 18 ¶ 1.) In reality, however, much of IBM's business involves using the innovative efforts of others. In this case, IBM's products and services, including its Connections Cloud S1, QRadar Vulnerability Manager, and Cloud Video, depend on inventions developed by this country's titans of telecommunications— and acquired by Ebates Performance Marketing as part of its efforts to provide an efficient and pleasing experience for retailers and consumers doing business over the Internet.

3.      High-speed broadband networks are considered indispensable to American and global commerce today. But at the turn of the twenty-first century, they were in their infancy. Attempts to rapidly expand these networks were met with numerous problems relating to content delivery, security, and resource management. The inventions described and claimed in U.S. Patent Nos. 7,962,960 (the "'960 Patent"), 8,072,968 (the "'968 Patent"), and 6,697,861 (the "'861 Patent") (collectively, the "Counterclaim Patents-in-Suit"), represent unique, novel and highly technical solutions to those problems.

4.      The solutions claimed in the Counterclaim Patents-in-Suit are also an essential part of IBM's Connections Cloud S1, QRadar Vulnerability Manager, and Cloud Video. Yet, rather than license these solutions—or design its own—IBM has chosen to utilize Ebates Performance Marketing's intellectual property rights without authorization. Accordingly, Ebates Performance Marketing has no recourse but to assert these Counterclaims to prevent IBM's unauthorized use of Ebates Performance Marketing's patented technology.

## PARTIES

5.      Counterclaim Plaintiff Ebates Performance Marketing is a Delaware corporation, with its principal place of business at 800 Concar Drive., San Mateo, California, 94402.

6.      On information and belief, based on the statements made in its First Amended Complaint, Counterclaim Defendant IBM is a New York corporation, with its principal place of business at 1 New Orchard Road, Armonk, New York 10504.

## JURISDICTION AND VENUE

7.      This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

8.      This Court has personal jurisdiction over IBM because among other reasons, IBM has availed itself of the legal protections of this District by voluntarily submitting to and employing the jurisdiction of this Court as plaintiff in this matter. This Court also has personal jurisdiction because IBM conducts business in Delaware, at least by offering for sale and selling products and services through its websites and mobile applications, which are accessible in Delaware, and because infringement has occurred and continues to occur in Delaware.

9.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b) because, among other reasons, IBM has voluntarily submitted to the jurisdiction of the Court in this matter. Venue is also proper because IBM conducts business in Delaware, at least by offering for sale and selling products and services through its websites and mobile applications, which are accessible in Delaware, and because infringement has occurred and continues to occur in Delaware.

3

## BACKGROUND

**A.     Ebates Performance Marketing**

10.     Ebates Performance Marketing, formerly known as Ebates, was founded in 1999. The Ebates Performance Marketing website and Cash Back mobile application have become the go-to shopping companion for consumers.

11.     Ebates Performance Marketing offers cash rebates (which it refers to as "Cash Back"), deals and shopping rewards on the world's largest selection of products and services. Ebates Performance Marketing has partnered with over 2,500 merchants, such as, Best Buy, JCPenney, Kohl's, Macy's, Nordstrom, Old Navy, Priceline, and Target. Ebates Performance Marketing has helped shape the way people shop online.

12.     Ebates Performance Marketing has more than 14 million members in the U.S. alone. Using Ebates Performance Marketing's services, its members have earned over $2 billion in Cash Back.

13.     Ebates Performance Marketing is an award-winning brand. Its multi-year effort to rebrand its Cash Back portal from Ebates to Rakuten Rewards won best Rebrands/Relaunch and best Brand Content Strategy at The Drum Marketing Awards USA 2020.

14.     Ebates Performance Marketing has achieved additional success with its innovative browser extension which automatically notifies users when Cash Back is available, alerts users when a product being browsed is available at a better price, and applies coupon codes at checkout. Ebates Performance Marketing's extension has received praise from NBC and CNET, the world's leader in tech product reviews.

**B.     The '960 Patent**

15.     The '960 Patent is entitled "Systems and Methods for Performing Risk Analysis." The '960 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the

4

United States Code. Counterclaim Plaintiff is the assignee of all rights, title, and interests in and to the '960 patent and holds the right to sue and recover for past, present, and future infringement thereof. A copy of the '960 patent is attached as Exhibit 1.

16.     The inventions disclosed and claimed in the '960 Patent were developed by Verizon Wireless, Inc. ("Verizon") to improve network vulnerability identification technology. Malicious attackers often try to attack a company's network to steal the company's private information or even the personal information of the company's customers or employees. '960 Patent at 1:20-24. Sometimes, bad actors attempt to attack a company by overloading the company's network capacity to shut down the company's web server or network. *Id.* at 1:24-26. To protect against these threats, companies are forced to spend time and money analyzing their networks to identify vulnerabilities that these bad actors might exploit. *Id*. at 1:26-29.

17.     Before the inventions claimed in the '960 patent, the conventional method of identifying network vulnerabilities involved analyzing each network device individually to identify the mostly likely attack point for that device. *Id.* at 1:31-34. The network engineer would then report the vulnerability to the person in the company who was responsible for taking actions to mitigate the risks of attack. *Id.* at 1:34-37. However, this method was very time consuming and costly for the company. *Id.* at 1:37-38.

18.     This method encountered further complications when used on a dynamically changing network. *Id.* at 1:39-41. When a new network device was added to the network, the company would have to track any new network device and then assign a network engineer to identify the vulnerabilities associated with the new device. *Id.* at 1:41-45. Accordingly, the more changes a network experienced, the more time and money it would cost the company to identify potential network vulnerabilities. *Id.* at 1:39-41, 1:45-46.

19.     Verizon, as one of the country's largest telecommunications providers, recognized a need for a more efficient method of analyzing a network for vulnerabilities, in a world of ever expanding and changing networks. The inventors of the '960 patent developed innovative systems and methods for performing risk analysis, using a processing device, configured to receive information corresponding to identified vulnerabilities of a network device, to generate a risk level indicator for the network device based on values associated with the identified vulnerabilities. The inventors of the '960 patent developed a system and method for performing risk analysis that combined several key features in a unique and innovative manner.

20.     The claims of the '960 patent are not directed to an abstract idea, and do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet or on a computer. Nor are the claims of the '960 patent merely attempting to limit a method of organizing human activity or an idea itself to a particular technological environment. The claims of the '960 patent are expressly directed to a technical way to more efficiently analyze a network for vulnerabilities.

21.     The claims of the '960 Patent, when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components. The claimed inventions were not well-known, routine, or conventional at the time of the invention, over fifteen years ago, and represent specific improvements over the prior art and existing systems and methods. The claimed systems and methods for performing risk analysis was not known in the prior art at the time of the invention. Moreover, the claimed methods and systems of the '960 Patent—involving, *inter alia*, the use of a processing device configured to receive information corresponding to identified vulnerabilities of a network device to generate a risk level indicator for the network device based on values

associated with the identified vulnerabilities—improved network vulnerability analysis because it permitted more efficient vulnerability monitoring on dynamically changing networks.

22.     The '960 patent explains in technical detail how a risk indicator is generated based on the identified vulnerability of the network. In particular, the '960 patent describes how the hardware processing device of the network monitoring system works in conjunction with a user device to monitor and determine the risk indicators associated with the vulnerabilities of the network devices. '960 patent at 10:25-40. The specification provides detailed technical disclosures regarding how the network monitoring system assigns numerical values associated with particular vulnerabilities in the system. *See, e.g., id.* at 7:59-8:51. Further, the specification provides technical examples of how the network monitoring system uses the numerical values associated with particular vulnerabilities in the system to generate a risk indicator score for the network. *Id.* at 9:15-50. The specification also explains how the network monitoring system further utilizes technical exceptions to the security rules to improve vulnerability monitoring and network management. *Id.* at 9:51-10:24.

23.     The claimed invention is tethered to the technical improvement. The specification describes in detail the specific way a more efficient network vulnerability monitoring system is achieved.

**C.     The '968 Patent**

24.     The '968 Patent is entitled "Method and Apparatus for Supporting Multiple Active Sessions on a Per User Basis." The '968 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. Counterclaim Plaintiff is the assignee of all rights, title, and interests in and to the '968 patent and holds the right to sue and recover for past, present, and future infringement thereof. A copy of the '968 patent is attached as Exhibit 2.

7

25.    The inventions disclosed and claimed in the '968 Patent were developed by AT&T Inc. ("AT&T") to allow a network to support multiple simultaneous application sessions for a single user. Before the inventions, although service providers provided multiple services, such as voice, video and data, these services were conventionally provided and maintained as separate individual sessions to their subscribers. For example, a service provider could provide a telephone service to a subscriber and also provide a television service to a subscriber. However, these services were only provided and maintained as separate audio and video sessions to the subscriber.

26.    AT&T, as one of the largest network service providers at the time, recognized that as more residential homes had access to extremely high bandwidth networks, it would be more convenient for users if network service providers could integrate the user's voice, video and data sessions. '968 patent at 1:18-22. Although service providers were offering multiple services (i.e. voice, video, and data) to its users, their networks did not support multiple simultaneous active application sessions to a single subscriber's video display. *Id.* at 7:27-29.

27.    The inventors of the '968 patent solved this problem by using a packet network, e.g., a SoIP network, which provides a method for establishing multiple active application sessions which could be displayed on the subscriber's display device. *Id.* at 7:33-37.

28.    The claims of the '968 patent are not directed to abstract ideas, and do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet or on a computer. Nor are the claims of the '968 patent merely attempting to limit a method of organizing human activity or an idea itself to a particular technological environment. The claims of the '968 patent are expressly directed to

8

establishing multiple live application sessions in a communication network which are then displayed on a video display device in a unique and innovative manner.

29.     The claims of the '968 patent, when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components. The claimed inventions were not well-known, routine, or conventional at the time of the invention, over ten years ago, and represent specific improvements over the prior art and existing systems and methods. The claimed methods for establishing multiple application sessions and displaying them on a video device were a specific and technical improvement over conventional, prior art methods at the time of invention. The methods of the claimed inventions support multiple simultaneous application sessions to a single subscriber, rather than providing and maintaining each session separately to the subscriber. This inventive technological improvement over the prior art is laid out in the specific limitations of the '968 patent claims.

**D.     The '861 Patent**

30.     The '861 Patent is entitled "Web Based Extranet Architecture Providing Applications To Non-Related Subscribers." The '861 patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code. Counterclaim Plaintiff is the assignee of all rights, title, and interests in and to the '861 patent and holds the right to sue and recover for past, present, and future infringement thereof. A copy of the '861 patent is attached as Exhibit 3.

31.     The inventions disclosed and claimed in the '861 Patent were developed by SBC Communications Inc. ("SBC") to enable an extranet service to provide a large variety of applications to non-related subscribers.  At the time of the inventions, organizations had limited options available to allow communication and application sharing between non-related

9

organizations. One conventional extranet architecture was a shared private network, where the organizations that had access are enumerated, with a third party in charge of updating the list of enumerated users and passwords. This option was disadvantageous because it was only useful for limited purposes and limited employees of the organization, and typically had lower data communications. '861 patent at 1:28-51.

32.     Another conventional option at the time was an extranet architecture that coupled a plurality of nonrelated organizations together with appropriate routing and traffic management capabilities. *Id.* at 1:52-54. Although this option allowed the organization to communicate with one another and share various applications, it was expensive to implement and burdensome on the party in charge of maintaining the extranet. Additionally, this option lacked the bandwidth to accommodate a large number of applications. *Id.* at 56-64.

33.     A third conventional option available at the time was for organizations to be coupled using a virtual private network (VPN). *Id.* at 1:64-2:5. Although this option provided increased bandwidth, it lacked the security of shared private networks. *Id.* at 1:64-66. As one of the largest telecommunication companies at the time, SBC recognized there was a need for an extranet architecture that provided the bandwidth to support a wide diversity of applications being shared by non-related organizations. SBC also recognized that it would be desirable for the architecture to be secure while also eliminating the need for any one organization to maintain the diversity of applications. *Id.* at 2:14-22.

34.     The inventors of the '861 patent solved this problem by providing an extranet architecture capable of sharing a large variety of applications with non-related subscribers, while also allowing secure communication and data exchange amongst the subscribers. *Id.* at 2:26-3:17.

35.     The claims of the '861 patent are not directed to abstract ideas, and do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet or on a computer. Nor are the claims of the '861 patent merely attempting to limit a method of organizing human activity or an idea itself to a particular technological environment. The claims of the '861 patent are expressly directed to a unique and innovative technical network architecture for sharing a large variety of applications, stored at a common location, amongst non-related organizations using an extranet service.

36.     The claims of the '861 patent, when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components. The claimed inventions were not well-known, routine, or conventional at the time of the invention, over twenty years ago, and represent specific improvements over the prior art and existing systems and methods. The claimed method for sharing a large variety of applications between non-related organizations was an improvement over conventional prior art architectures at the time of invention. Not only does the method provided by the claimed invention allow for non-related organizations to share a large variety of applications, but it also allows a workgroup of extranet subscribers to securely communicate and exchange data. This inventive technological improvement over the prior art is laid out in the specific limitations of the '861 patent claims.

**E.     IBM's Infringing Actions**

37.     The '960 patent is generally directed to a method for analyzing a network element for performing risk analysis. In particular, the method describes a network monitoring system which includes a hardware processing device and an interface to a user device. The network monitoring system scans a network device and generates a risk indicator based on values associated with the identified vulnerabilities of the network device. The network monitoring

system of the '960 patent then adjusts the risk indicator based on certain exceptions to the security rules. The network monitoring system then provides the adjusted risk indicator to the user device.

38.    IBM makes, designs, uses, sells, offers for sale and/or provides the QRadar Vulnerability Manager, the QRadar Risk Manager, and the QRadar console (the "Accused IBM QRadar system"), which include a network monitoring system; a hardware processing device and an interface to a user device; and the QRadar Vulnerability Manager, which scans a network device and generates a risk score for the network device based on the Common Vulnerability Scoring System (CVSS). The risk score is based on values associated with the vulnerabilities identified by the Accused IBM QRadar system.

39.    Upon information and belief, the Accused IBM QRadar system meets each and every limitation of at least one claim of the '960 patent, as described in further detail below.

40.    The '968 patent is generally directed to a method and apparatus for simultaneously supporting multiple application sessions. In particular, the method and apparatus of the '968 patent can simultaneously support application sessions such as video, audio, voice, and data sessions.

41.    IBM makes, designs, uses, sells, offers for sale and/or provides the IBM Cloud Video service, which supports a plurality of application sessions in a communication network. The IBM Cloud Video service allows desktop computers and mobile devices to stream live video and manage recorded video content. The IBM Cloud Video supports live video streaming with multiple audio tracks as well as real time chat functionalities.

42.    Upon information and belief, the IBM Cloud Video service meets each and every limitation of at least one claim of the '968 patent, as described in further detail below.

43.     The '861 patent is generally directed to a method for providing an extranet service between at least two subscribers. In particular, the method of the '861 patent provides an extranet architecture utilizing Web based technology that provides a large variety of applications to non-related subscribers.

44.     IBM makes, designs, uses, sells, offers for sale and/or provides the IBM Connections Cloud S1 service, which provides an extranet service between subscribers. The IBM Connections Cloud S1 service stores collaboration software applications in a common location that is accessible to its extranet subscribers. The IBM Connections Cloud S1 shares the collaboration software applications with its subscribers. The IBM Connections Cloud S1 also provides secure communication and data among a workgroup of subscribers.

45.     Upon information and belief, the IBM Connections Cloud S1 service meets each and every limitation of at least one claim of the '861 patent, as described in further detail below.

## COUNT I
## Infringement of U.S. Patent No. 7,962,960

46.     Counterclaim Plaintiff repeats and realleges paragraphs 1-45 above as though fully set forth herein.

47.     IBM has and continues to infringe one or more claims of the '960 patent in this judicial district and elsewhere in the United States.

48.     IBM infringes, literally and/or under the doctrine of equivalents, one or more claims of the '960 patent. For example, IBM directly infringes one or more claims of the '960 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by making, designing, using, selling, offering for sale and/or providing the Accused IBM QRadar system in the United States. Alternatively, IBM has contributed to the infringement of the '960 patent under 35 U.S.C. § 271(c), literally and/or under the doctrine of equivalents, by making, designing,

using, selling, offering for sale and/or providing the components, materials or apparatuses for use in practicing the patented methods of the '960 patent by end users, as described below. Alternatively, IBM has induced others, including end users and customers, to infringe one or more claims of the '960 patent under 35 U.S.C. § 271(b).

49.    For example, and without limitation, IBM directly infringes at least Claim 12 of the '960 patent, literally and/or under the doctrine of equivalents, through its use of the Accused IBM QRadar system.

50.    Claim 12 of the '960 patent recites:

A method comprising:

providing, by a network monitoring system that includes a hardware processing device, an interface to a user device, the interface including options associated with monitoring network devices;

receiving, by the network monitoring system, an input from the user device;

identifying, by the network monitoring system, at least one network device in response to the input;

generating, at the network monitoring system, a risk indicator associated with the at least one network device, the risk indicator representing a relative risk associated with the at least one network device, said risk indicator based on one or more vulnerabilities of the at least one network device, where generating the risk indicator comprises:

    signaling a scanner device to perform a scan of the at least one network device,

    receiving data from the scanner device, the data being associated with results of the scan of the at least one network device,

    identifying one or more vulnerabilities associated with the at least one network device based on the received data, and

    generating the risk indicator for the at least one network device based on values associated with the identified vulnerabilities;

adjusting, by the network monitoring system and subsequent to generating the risk indicator, the risk indicator based on exceptions to security rules; and

providing the adjusted risk indicator to the user device from the network monitoring system.

51.     As one non-limiting example of IBM's infringement, the Accused IBM QRadar system comprises a network monitoring system which includes at least the QRadar Vulnerability Manager, the QRadar Risk Manager, and the QRadar Console, which is a network monitoring system. The QRadar Console is a hardware processing device. The QRadar Vulnerability Manager provides an interface to a user device. This interface includes options associated with monitoring network devices, including scanning options such as the option to select the scanner use and options regarding the scanning policy. On information and belief, IBM uses the Accused IBM QRadar system in order to provide, by a network monitoring system that includes a hardware processing device, an interface to a user device, the interface including options associated with monitoring network devices.

52.     Upon information and belief, IBM uses the Accused IBM QRadar system to receive input from the user device, such as a scan job.

53.     Upon information and belief, IBM uses the QRadar Vulnerability Manager in the Accused IBM QRadar system to, in response to a scan job, identify at least one network device (i.e., one or more assets) to scan.

54.     Upon information and belief, IBM uses the network monitoring system of the Accused IBM QRadar system to generate a risk indicator (i.e., a risk score) associated with the at least one network device (i.e., one or more asset) based on the Common Vulnerability Scoring System (CVSS). Upon information and belief, the risk score represents a relative risk associated with the asset based on the one or more vulnerabilities of the asset.

55.     Upon information and belief, IBM uses the QRadar Vulnerability Manager of the Accused IBM QRadar system to signal a scanner device to perform a scan of the at least one network device (i.e., one or more assets) for vulnerabilities in order to generate the risk indicator

(i.e., a risk score). The scanner device uses scan tools to perform the scan. The results from the scan tools is read by a result writer of the scanner device. Upon information and belief, IBM uses the Accused IBM QRadar system to receive the results of the scan from the scanner device in order to generate the risk indicator (i.e., a risk score).

56.     Upon information and belief, IBM uses the QRadar Vulnerability Manager of the Accused IBM QRadar system to identify one or more vulnerabilities of the asset based on the results of the scan in order to generate the risk indicator (i.e., a risk score). Upon information and belief, IBM uses the Accused IBM QRadar system to generate a risk score for the asset based on the identified vulnerabilities of the asset. This risk score may be displayed when viewing vulnerability data on, for example, the "By Asset" page in the QRadar Vulnerability Manager.

57.     The QRadar Risk Manager is used to configure policies that adjust vulnerability risk scores by, e.g., increasing or decreasing the risk associated with one or more vulnerabilities. Upon information and belief, after the risk score is generated, IBM uses the QRadar Vulnerability Manager to adjust the risk based on exceptions to security rules using the QRadar Risk Manager.

58.     Upon information and belief, IBM uses the Accused IBM QRadar system to provide the adjusted risk indicator (i.e., the adjusted risk score) to the user device via the QRadar Vulnerability Manager. This adjusted risk score is provided when it is displayed on, for example, the "By Asset" page in the QRadar Vulnerability Manager.

59.     IBM has known of the '960 patent since prior to the filing of these Counterclaims. For example, the '960 patent was cited during the prosecution of three different IBM patents, including U.S. Patent Nos. 8,775,607, 9,742,778 and 10,171,494. Upon information and belief, IBM has known or was willfully blind to the fact that Accused IBM QRadar system, which includes the QRadar Vulnerability Manager (which IBM markets as a tool for scanning for

vulnerabilities and providing a risk score) and the QRadar Risk Manager (which IBM markets as a tool for adjusting risk policies in order to adjust a risk score) would infringe one or more claims of the '960 patent, including at least claim 12.

60.     Additionally, IBM has known of the '960 patent since at least as early as the service date of these Counterclaims.

61.     Upon information and belief, since at least the above-mentioned dates when IBM was on notice of its infringement, IBM has actively induced, under U.S.C. § 271(b), its customers and/or end users that use the Accused IBM QRadar system to directly infringe one or more claims of the '960 patent, with knowledge, and/or with willful blindness of the fact, that the induced acts constitute infringement of the '960 patent. IBM's customers and/or end users have directly infringed and are directly infringing, either literally and/or under the doctrine of equivalents, the inventions claimed in the '960 patent through their use of the Accused IBM QRadar system. IBM induces this direct infringement through its affirmative acts of selling, distributing, and/or otherwise making available the Accused IBM QRadar system, and providing technical guides, demonstrations, advertisements, installation guides, and other forms of support that induce their customers, and/or end users to directly infringe the '960 patent. The Accused IBM QRadar system is designed in such a way that when it is used for its intended purpose, the user infringes the '960 patent. IBM knows and intends that its customers, and/or end users that purchase the Accused IBM QRadar system will use that product for its intended purpose.

62.     Upon information and belief, despite knowledge of the infringement of the '960 patent, IBM has intended and continues to intend to contribute to patent infringement by third parties by selling, offering to sell, and/or supplying components, materials, or apparatuses for

17

use in practicing the patented methods of the '960 patent by end users and consumers, as described in this section.

63.     For example, IBM provides the software components of the Accused IBM QRadar system to customers and end users for use in infringing the '960 patent, and such software does not have substantial non-infringing uses. Such software is especially made and/or especially adapted for use in infringing the '960 patent and is not a staple article or commodity of commerce suitable for substantial non-infringing use. The only substantial use of the Accused IBM QRadar system is for the claimed subject matter involving the generation and adjustment of a risk score as described in the '960 patent.

64.     IBM is, thus, at minimum, liable to Counterclaim Plaintiff in an amount that adequately compensates Counterclaim Plaintiff for IBM's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

65.     The continued infringement by IBM of the '960 patent after learning of its infringement is deliberate and willful, entitling Counterclaim Plaintiff to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT II
## Infringement of U.S. Patent No. 8,072,968

66.     Counterclaim Plaintiff repeats and realleges paragraphs 1-65 above as though fully set forth herein.

67.     IBM has and continues to infringe one or more claims of the '968 patent in this judicial district and elsewhere in the United States.

68.     IBM infringes, literally and/or under the doctrine of equivalents, one or more claims of the '968 patent. For example, IBM directly infringes one or more claims of the '968 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by making, designing, using, selling, offering for sale and/or providing the IBM Cloud Video service in the United States. Alternatively, IBM has contributed to the infringement of the '968 patent under 35 U.S.C. § 271(c), literally and/or under the doctrine of equivalents, by making, designing, using, selling, offering for sale and/or providing the components, materials or apparatuses for use in practicing the patented methods of the '968 patent by end users, as described below. Alternatively, IBM has induced others, including end users and customers, to infringe one or more claims of the '968 patent under 35 U.S.C. § 271(b).

69.     For example, IBM directly infringes at least Claim 1 of the '968 patent, literally and/or under the doctrine of equivalents, through its use of the IBM Cloud Video service.

70.     Claim 1 of the '968 patent recites:

A method for supporting a plurality of application sessions in a communication network, comprising:

receiving a plurality of application session setup requests from a subscriber by the communication network; and

establishing simultaneously with an endpoint device of the subscriber a plurality of active application sessions requested by the subscriber, wherein the plurality of active application sessions comprises at least two of: a video session, a data session, an audio session, and a voice session, wherein the establishing enables the plurality of active application sessions to be active simultaneously for the subscriber.

71.     As one non-limiting example of said infringement, the IBM Cloud Video service provides a cloud video service which supports a plurality of application sessions. IBM uses the IBM Cloud Video service in order to support video, chat and Q&A sessions in a communication network (e.g., over the Internet).

19

72.     Upon information and belief, IBM uses the IBM Cloud Video service to receive a plurality of application session setup requests, including requests over the Internet from subscribers to setup video, chat and/or Q&A sessions.

73.     Upon information and belief, IBM uses the IBM Cloud Video service to establish simultaneously on a subscriber's endpoint device (e.g., a desktop computer or mobile device) the plurality of active application sessions including at least two of: a video session (e.g., for live or recorded video) and a data session (e.g., chat and/or Q&A sessions).

74.     For example, upon information and belief, IBM uses the IBM Cloud Video service to enable a subscriber to stream a live video session simultaneously with a Q&A session or an chat session.

75.     IBM has known of the '968 patent since at least as early as the service date of these Counterclaims.

76.     Upon information and belief, since at least the above-mentioned date when IBM was on notice of its infringement, IBM has actively induced, under U.S.C. § 271(b), its customers that use the IBM Cloud Video service to directly infringe one or more claims of the '968 patent, with knowledge, and/or with willful blindness of the fact, that the induced acts constitute infringement of the '968 patent. IBM's customers and/or end users have directly infringed and are directly infringing, either literally and/or under the doctrine of equivalents, the inventions claimed in the '968 patent through their use of the IBM Cloud Video service. IBM induces this direct infringement through its affirmative acts of selling, distributing, and/or otherwise making available the IBM Cloud Video service, and providing technical guides, demonstrations, advertisements, installation guides, and other forms of support that induce their customers to directly infringe the '968 patent. The IBM Cloud Video service is designed in such a way that

when it is used for its intended purpose, the customer infringes the '968 patent. IBM knows and intends that its customers that purchase the IBM Cloud Video service will use that product for its intended purpose.

77.     Upon information and belief, despite knowledge of the infringement of the '968 patent, IBM has intended and continues to intend to contribute to patent infringement by third parties by selling, offering to sell, and/or supplying components, materials, or apparatuses for use in practicing the patented methods of the '968 patent by end users and consumers, as described in this section.

78.     For example, IBM provides the computer code (such as HTML, JavaScript and CSS) underlying the IBM Cloud Video service to customers for use in infringing the '968 patent, and such computer code does not have substantial non-infringing uses. Such computer code is especially made and/or especially adapted for use in infringing the '968 patent and is not a staple article or commodity of commerce suitable for substantial non-infringing use. The only substantial use of this computer code is for the claimed subject matter involving the simultaneous establishment of a plurality of application sessions as described in the '968 patent.

79.     IBM is, thus, at minimum, liable to Counterclaim Plaintiff in an amount that adequately compensates Counterclaim Plaintiff for IBM's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

80.     The continued infringement by IBM of the '968 patent after learning of its infringement is deliberate and willful, entitling Counterclaim Plaintiff to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT III
## Infringement of U.S. Patent No. 6,697,861

81.     Counterclaim Plaintiff repeats and realleges paragraphs 1-80 above as though fully set forth herein.

82.     IBM has and continues to infringe one or more claims of the '861 patent in this judicial district and elsewhere in the United States.

83.     IBM has infringed, literally and/or under the doctrine of equivalents, one or more claims of the '861 patent. In particular, IBM has directly infringed one or more claims of the '861 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by making, designing, using, selling, offering for sale and/or providing the IBM Connections Cloud S1 service in the United States. Alternatively, IBM has contributed to the infringement of the '861 patent under 35 U.S.C. § 271(c), literally and/or under the doctrine of equivalents, by making, designing, using, selling, offering for sale and/or providing the components, materials or apparatuses for use in practicing the patented methods of the '861 patent by end users, as described below. Alternatively, IBM has induced others, including end users and customers, to infringe one or more claims of the '861 patent under 35 U.S.C. § 271(b).

84.     For example, IBM directly infringes at least Claim 10 of the '861 patent, literally and/or under the doctrine of equivalents, through its use of the IBM Connections Cloud S1 service.

85.     Claim 10 of the '861 patent recites:

An extranet method comprising:

accessing subscriber subscription information of a subscriber database listing extranet subscribers who subscribe to an extranet service;

storing at a common location accessible to the extranet subscribers software applications including at least one of

22

collaboration software applications,

workflow software applications,

transaction software applications,

electronic mail software applications, and

electronic data interchange software application;

communicating over a communication link with extranet subscribers;

sharing the stored software applications among the extranet subscribers in accordance with the subscriber subscription information;

associating a plurality of extranet subscribers as a workgroup of subscribers;

making the software applications available to subscribers of the workgroup; and

securing communication and data exchanged among the workgroup of subscribers.

86.     As one non-limiting example of said infringement, the IBM Connections Cloud S1 service provides an extranet service for authorized users. On information and belief, IBM uses the IBM Connections Cloud S1 service to perform an extranet method.

87.     Upon information and belief, IBM uses the IBM Connections Cloud S1 service to access subscriber subscription information (e.g., the list of authorized users and recipients of the service) of a subscriber database listing extranet subscribers who subscribe to an extranet service. These users may include guests invited to view or work on content shared with them.

88.     The IBM Connections Cloud S1 service stores a collection of collaboration tools which are accessible to the subscribers. Upon information and belief, IBM uses the IBM Connections Cloud S1 service to store, at a common location (i.e., in a single service) accessible to the extranet subscribers, software applications including at least one of collaboration software applications (e.g., instant messaging; collaborative document editors), workflow software applications, transaction software applications, electronic mail software applications (e.g. an e-mail service), and electronic data interchange software application (e.g., file sharing).

23

89.     Upon information and belief, IBM uses the IBM Connections Cloud S1 service to communicate over a communication link (e.g., a link over the Internet) with extranet subscribers.

90.     Upon information and belief, IBM uses the IBM Connections Cloud S1 service to share the stored software applications amongst the extranet subscribers (i.e., the authorized users and recipients of the service). The stored software applications are shared with extranet subscribers based on the subscriber subscription information in order to provide a subscriber with the set of software applications authorized for the subscriber's use.

91.     Upon information and belief, IBM uses the IBM Connections Cloud S1 service to associate a plurality of extranet subscribers (e.g., authorized users and recipients of the service) as a workgroup of subscribers. These workgroups include "communities," which enable colleagues, partners and customers to collaborate together, such as by sharing files, communicating via the IBM Connections Cloud S1 service and/or reading and editing documents using collaborative document editors.

92.     Upon information and belief, IBM uses the IBM Connections Cloud S1 service to make the software applications available to subscribers (e.g., authorized users and recipients of the service, such as guests invited to view or work on shared content) of the workgroup (e.g., community). For example, IBM uses the IBM Connections Cloud S1 service to allow communities of subscribers to share files, edit documents using collaborative document editors and communicate amongst members of the community.

93.     Upon information and belief, IBM secures communication and data exchanged amongst the workgroup of subscribers on the IBM Connections Cloud S1 service by encrypting communication and data on the service as well as by providing moderated and restricted communities which restrict access to a community's resources.

94.     IBM has known of the '861 patent since prior to the filing of these Counterclaims. For example, the '861 patent was cited during the prosecution of an IBM patent, U.S. Patent No. 6,941,474. Upon information and belief, IBM has known or was willfully blind to the fact that IBM Connections Cloud S1 service would infringe one or more claims of the '861 patent, including at least claim 10.

95.     Additionally, IBM has known of the '861 patent since at least as early as the service date of these Counterclaims

96.     Upon information and belief, since at least the above-mentioned dates when IBM was on notice of its infringement, IBM has actively induced, under U.S.C. § 271(b), its customers that use the IBM Connections Cloud S1 service to directly infringe one or more claims of the '861 patent, with knowledge, and/or with willful blindness of the fact, that the induced acts constitute infringement of the '861 patent. IBM's customers have directly infringed and are directly infringing, either literally and/or under the doctrine of equivalents, the inventions claimed in the '861 patent through their use of the IBM Connections Cloud S1 service. IBM induces this direct infringement through its affirmative acts of selling, distributing, and/or otherwise making available the IBM Connections Cloud S1 service, and providing technical guides, demonstrations, advertisements, installation guides, and other forms of support that induce their customers, and/or end users to directly infringe the '861 patent. The IBM Connections Cloud S1 service is designed in such a way that when it is used for its intended purpose, the customer infringes the '861 patent. IBM knows and intends that its customers that purchase the IBM Connections Cloud S1 service will use that product for its intended purpose.

97.     Upon information and belief, despite knowledge of the infringement of the '861 patent, IBM has intended and continues to intend to contribute to patent infringement by third

25

parties by selling, offering to sell, and/or supplying components, materials, or apparatuses for use in practicing the patented methods of the '861 patent by end users and consumers, as described in this section.

98.     For example, IBM provides the computer code (such as HTML, JavaScript and CSS) underlying the IBM Connections Cloud S1 service to customers for use in infringing the '861 patent, and such computer code does not have substantial non-infringing uses. Such computer code is especially made and/or especially adapted for use in infringing the '861 patent and is not a staple article or commodity of commerce suitable for substantial non-infringing use. The only substantial use of this computer code is for the claimed subject matter involving the secure provision of software applications to extranet subscribers as described in the '861 patent.

99.     IBM is, thus, at minimum, liable to Counterclaim Plaintiff in an amount that adequately compensates Counterclaim Plaintiff for IBM's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

100.    The continued infringement by IBM of the '861 patent after learning of its infringement is deliberate and willful, entitling Counterclaim Plaintiff to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## **REQUEST FOR RELIEF**

101.    Counterclaim Plaintiff respectfully requests that the Court find in its favor and against IBM and that the Court grant Counterclaim Plaintiff the following relief:

     a.  A judgment that IBM has directly infringed the Counterclaim Patents-in-Suit as alleged herein;

b.  A judgment that IBM has indirectly infringed the Counterclaim Patents-in-Suit as alleged herein;

c.  A judgment for an accounting of all damages, past and future, including lost profits, sustained by Counterclaim Plaintiff as a result of the acts of infringement by IBM;

d.  A judgment and order requiring IBM to pay Counterclaim Plaintiff damages under 35 U.S.C. § 284, including up to treble damages as provided by 35 U.S.C. § 284, and any royalties determined to be appropriate;

e.  A judgment and order requiring IBM to pay Counterclaim Plaintiff pre-judgment and post-judgment interest on the damages awarded;

f.  A judgment and order finding this to be an exceptional case and requiring IBM to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285; and

g.  Such other and further relief as the Court deems just and equitable.

**GREENBERG TRAURIG, LLP**

*/s/ Benjamin J. Schladweiler*
Benjamin J. Schladweiler (#4601)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Phone: (302) 661-7000
Fax: (302) 661-7360
schladweilerb@gtlaw.com

Of Counsel:

Joshua L. Raskin
RaskinJ@gtlaw.com
Allan A. Kassenoff
KassenoffA@gtlaw.com
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone: 212.801.9200
Facsimile: 212.801.6400

*Counsel for Counterclaim Plaintiff Ebates Performance Marketing, Inc. dba Rakuten Rewards*

DATED: September 7, 2021